IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-1481

_____

IN THE MATTER OF: HABER OIL, CO., INC.,

Debtor.

HABER OIL, CO., INC.,

Appellant,

v.

DAVID D. SWINEHART,

Appellee.

_____

No. 92-9067

_____

IN THE MATTER OF: HABER OIL COMPANY, INC.,
and JAY D. HABER,

Debtors,

HABER OIL COMPANY, INC.,

Appellant,

v.

DAVID SWINEHART,

Appellee.

*****************************

_____

Appeals from the United States District Court
for the Northern District of Texas
_____
(January 12, 1994)

Before KING and BARKSDALE, Circuit Judges and DUPLANTIER[*], District Judge.

KING, Circuit Judge:

Just as medieval alchemists bent all their energies to discovering a formula that would transmute dross into gold, so too do modern creditors' lawyers spend prodigious amounts of time and effort seeking to convert their clients' general, unsecured claims against a bankrupt debtor into something more substantial. The creditor's lawyer in this case achieved success in this regard that can only be described as phenomenal, transforming the lead of a breach of contract claim into the gold of a constructive trust and, in turn, into the platinum of cash when it turned out that the real property on which the trust was belatedly to be imposed had been sold. Under our Bankruptcy Code, such sorcery demands the highest attention to the requirements of pleading and proof by its practitioner. Because those requirements were not met, we are required to REVERSE in part the decision of the court below.

## I. BACKGROUND

### A. *Facts*

The appellant in this case is the bankrupt debtor, Haber Oil, Inc. ("Haber Oil"), a corporation that was involved in the acquisition, promotion, and development of oil and gas leases.

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

The appellee is one of Haber Oil's creditors, petroleum geologist David Swinehart.

Swinehart and Haber Oil entered into a series of four contracts, under the terms of which Swinehart agreed to locate, evaluate, and recommend oil and gas drilling prospects to Haber Oil. The dispute in this case concerns only the third and fourth contracts. The third contract, dated July 9, 1982, expressly superseded the prior contract and provided that Swinehart would receive, as compensation for his services, a monthly retainer of $8000 (subject to reduction for production revenues received by Swinehart) and 50% of Haber Oil's carried working interest or other retained revenue interest. The third contract was to expire on December 31, 1983. Before the expiration of the third contract, however, Swinehart and Haber Oil entered into the fourth contract, dated November 21, 1983. The fourth contract, which did not expressly supersede the third contract, provided that it would go into effect on December 1, 1983, and would expire on June 30, 1984. Under the fourth contract, Swinehart was entitled to receive a monthly retainer of $6000 (subject to reduction for production revenues received by Swinehart) and some office and car expenses. Additionally, Swinehart was entitled to a 6% working interest in wells drilled by Haber Oil on prospects reviewed and recommended by Swinehart, and 25% of other interests retained by Haber in prospects without drilled or completed wells.

3

It appears that Haber Oil's drilling program was largely unsuccessful during much of the period the third contract was in effect. While the third contract was in effect, and before the parties executed the fourth contract, Swinehart reviewed and recommended to Haber Oil six prospects, namely the West Mohat, Cooks Lake, Rosenberg, Deep Bayou, Northwest Englehart, and Black Jack Creek East prospects ("the disputed properties"). Drilling on the disputed properties did not begin until after the effective date of the fourth contract, and significant amounts of oil and gas were eventually discovered on some of the disputed properties. No attempt to drill was ever made on the Black Jack Creek East prospect.

The relationship between Swinehart and Haber Oil grew ever more strained, and a dispute arose between Swinehart and Haber Oil regarding the ownership interest due Swinehart. Finally, in the spring of 1984, Haber Oil sent Swinehart a notice that it was terminating their contractual relationship. Swinehart, in turn, filed a lawsuit against Haber Oil and its president, Jay Haber, in August 1984 in Texas state district court ("the state lawsuit"). In the state lawsuit, Swinehart sought, among other things, a constructive trust to be imposed on certain properties based on breach of a confidential relationship between Swinehart and Haber Oil, an accounting, and compensatory and punitive damages. It appears that purchasers of the minerals produced from the disputed properties paid funds into the state court's registry during the pendency of the state lawsuit, awaiting the

4

eventual determination of ownership.  This litigation was still pending when Haber Oil filed for protection under Chapter 11 of the United States Bankruptcy Code on March 2, 1987.

## B. *Procedural History*

After Haber Oil filed for bankruptcy, Swinehart filed a proof of claim in the bankruptcy court seeking damages in the amount of $2,300,000.  Swinehart did not claim that he held any security interest for his claim, but he apparently attached to his proof of claim his pleadings from the state lawsuit against Haber Oil and Jay Haber.  Haber Oil filed an objection to Swinehart's claim, alleging that the claim was "disputed contingent and unliquidated," and also alleging that more than enough funds had been placed in escrow to satisfy Swinehart's claim.  Swinehart responded to the objection, alleging that he would be entitled to priority status as to part of his claim following a favorable outcome in his pending state lawsuit.

On July 22, 1988, Swinehart filed an "expedited application to temporarily allow claim for the purpose of voting on plan of reorganization."  Three days later he filed an objection to confirmation of the plan of reorganization, contending that the plan would discharge his claim pending in the state court without ever being adjudicated.

At this point, a significant discrepancy develops between the account of the proceedings given by Swinehart in his brief and the documents actually contained in the record.  According to Swinehart's brief before this court, he filed an adversary

5

proceeding on July 21, 1988 (elsewhere in his brief he states that the date was July 27, 1988), raising issues of contract application and fraud and seeking the imposition of a constructive trust. He also states that the bankruptcy court logged this proceeding as Adversary No. 288-2054. Swinehart, however, does not provide any citations to the record to substantiate these assertions, and we have been unable to discover any complaint or summons in the record as would have been necessary to initiate an adversary proceeding. We do find, however, the above-mentioned "objection to confirmation of plan," which was filed on July 25, 1988, under docket numbers 287-20131 and 287-20130 (the case numbers assigned to the Haber Oil and Jay Haber bankruptcies). Needless to say, an objection to a reorganization plan is a far cry from the formal filings required to initiate an adversary proceeding. The objection did state that Swinehart was seeking a constructive trust in the pending state lawsuit, and that a discharge in bankruptcy without resolution of the state lawsuit would allow the debtor or its successors to "unjustly and inequitably" hold title to interests rightfully belonging to Swinehart.

The bankruptcy court approved the debtor's plan of reorganization by order entered on July 28, 1988. Under the plan, McFadden Acquisition Corporation ("McFadden"), an unrelated entity, was to advance to Haber Oil the cash required to fund the plan and was to obtain a security interest in all property in the Haber Oil estate. Although Swinehart is not specifically treated

6

in the plan, there is a handwritten notation by the bankruptcy judge at the bottom of the approval order to the effect "that Haber Oil will not seek to withdraw the funds held in escrow on account of the Swinehart [claim]."  The post-confirmation committee filed an objection to Swinehart's claim in October 1988.  Swinehart filed a response to the committee's objection, in which he stated, "The Post-Confirmation Committee is supposed to represent the interests of all the general unsecured creditors of J. D. Haber and Haber Oil Company, Inc.  David D. Swinehart is a member of that class, having filed a valid timely Proof of Claim in each of these matters."

The record next discloses that counsel for Haber Oil filed a trial memorandum in support of the objection to Swinehart's claim on November 22, 1988.  The trial memorandum is devoted largely to the issue of whether Swinehart's compensation with respect to the disputed properties should be determined by the third contract or the fourth contract (Haber Oil arguing that the fourth contract should govern).  On November 30, 1988, counsel for Swinehart filed an unsigned trial memorandum in support of Swinehart's claim; in this document, that claim has ballooned into an amount "in excess of 4.35 million dollars."  Swinehart's counsel also alleged in his memorandum that a "confidential relationship" existed between Swinehart and Haber Oil in connection with their joint activities, and the memorandum requested the court to impose a constructive trust on the disputed properties and award Swinehart either his ownership interests in the properties or

7

their fair market value.  The memorandum also contains a general allegation of fraud.

The bankruptcy court held a hearing on these matters on December 1, 1988.  The clerk called the case as "case number 287-20131 and 287-20130, Haber Oil Company, Inc., Jay D. Haber on an objection to the claim of David Swinehart brought by the debtors, and it's also adversary number 288-2054, David Swinehart versus Haber Oil Company and Jay D. Haber for trial."  The bankruptcy court decided that two issues were presented for its decision: (1) whether the third or fourth contract governed Swinehart's rights, and (2) accounting and valuation.  The court limited the scope of the hearing to the first issue.  After hearing testimony, the bankruptcy court ruled that the third contract governed Swinehart's rights and that the fourth contract was to operate only prospectively, with respect to new prospects reviewed and recommended by Swinehart.  The court ordered Haber Oil to provide a complete accounting of the amounts due Swinehart under the court's ruling, and it scheduled a hearing in March 1989 for the purpose of addressing any accounting issues, noting expressly that the "adversary proceeding rules would apply" and stating that the parties would be given copies of the court's instructions concerning adversary proceedings.  Finally, the court recommended to Haber Oil that it recover the properties if it had conveyed away Swinehart's interests in them.

On December 9, 1988, a motion was filed on behalf of Haber Oil urging the bankruptcy court to determine that the ongoing

8

claims objection proceedings were related proceedings rather than core proceedings. Haber Oil sought this determination in order to prevent the bankruptcy court from entering binding findings of fact and conclusions of law. Swinehart responded to the motion. This matter was consolidated with the other matters reserved by the bankruptcy court for later decision at the December 1, 1988, hearing. Haber Oil and Swinehart filed pretrial memoranda, and the bankruptcy court heard these matters on July 20 and 21, 1989. The bankruptcy court denied the December 9, 1988, "motion to determine related proceeding character" by written order entered July 26, 1989, because the motion was signed by Jay Haber's attorney and not by Haber Oil's attorney.

The bankruptcy court did not enter its written order and award concerning Swinehart's claim until September 4, 1990. The court found that the third contract governed Swinehart's claim for compensation with respect to the disputed properties. The court further found that "since the spud date of the first well on each of the prospects which are the subject of this dispute, Swinehart has owned the . . . percentage and type interest in the prospect" consistent with the terms of the third contract. The court then directed Haber Oil to prepare in recordable form an assignment of interest for each affected property reflecting the amount and type of Swinehart's interest and backdated to the spud date of the first well on each property. With respect to the funds being held in escrow in the state court (roughly $410,000), the court found that Swinehart owned those funds and Haber Oil

9

had no claim to them. Observing that Haber Oil had contended that the real property interests could not be given to Swinehart because they had been sold to McFadden, the court noted that Swinehart had "agreed to accept in cash the present value of those interests." Thus, the court ordered that Swinehart was to execute documents assigning his interests in those properties to Haber Oil, with an effective date of sale of January 1, 1989, and Haber Oil was to pay Swinehart some $971,000 for those interests. The court also allowed Swinehart an unsecured class 5 claim against Haber Oil in the amount of some $996,000, entitling him to some $318,000 under the confirmed plan of reorganization.

Haber Oil filed a motion to reconsider and vacate the September 4, 1990, award, and it also moved to alter or amend the judgment and for a new trial. The bankruptcy court held a hearing on these matters on October 19, 1990, at which time Haber Oil and several entities that had purchased minerals from the disputed properties argued strenuously that the bankruptcy court should not have awarded Swinehart interests in real property in the September 4 order because the protracted litigation leading up to that order had not been a full-fledged adversary proceeding as required by the bankruptcy rules, but rather a mere contested matter. On November 16, 1990, the bankruptcy court denied the motion for new trial and modified its September 4 order to reflect that it adjudicated only the rights of Haber Oil and Swinehart vis-a-vis the funds held in escrow in the state

10

lawsuit, and Haber Oil filed a notice of appeal of the September 4 order to the district court.

Haber Oil also initiated an adversary proceeding by filing a complaint to avoid transfer of real property interests under 11 U.S.C. § 544 on October 3, 1990. The complaint requested the bankruptcy court to void Swinehart's unrecorded property interests by virtue of the strong-arm powers conferred on Haber Oil by § 544 at the time of the commencement of Haber Oil's Chapter 11 bankruptcy proceeding. In Swinehart's response, he contended that the litigation culminating in the September 4 order was a true adversary proceeding and not mere "claims litigation" as asserted in Haber Oil's complaint. He also asserted 11 U.S.C. § 541(d) as a defense to Haber Oil's claim of § 544 powers. On March 7, 1991, stipulations of fact and a stipulation on the admissibility of exhibits were filed with the bankruptcy court. The bankruptcy court entered an order dismissing Haber Oil's adversary proceeding with prejudice on July 1, 1991. The court held that § 544 was not applicable because the interests in question were awarded to Swinehart post-petition rather than pre-petition; the court further held that Haber Oil could not avail itself of the court's equitable powers because it was seeking "to profit from its own misdeeds" and because "Chapter 11 of the Bankruptcy Code must not be used as a tool to perpetrate a fraud on a third party." The court also noted that avoidance of the transactions in question would not benefit the creditors of the bankrupt because they were

contractually limited to the recovery promised them under the plan of reorganization.  Haber Oil filed notice of its appeal from the dismissal to the district court.

The United States District Court for the Northern District of Texas affirmed the dismissal of Haber Oil's adversary proceeding on April 30, 1992, and it affirmed the September 4, 1990, bankruptcy court order on November 10, 1992.  Haber Oil appeals from both of these district court orders in this consolidated appeal.

## II. STANDARD OF REVIEW

This court reviews findings of fact by the bankruptcy court under the clearly erroneous standard and decides issues of law de novo. Killebrew v. Brewer (In re Killebrew), 888 F.2d 1516, 1519 (5th Cir. 1989).  "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed.'"  Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.), 712 F.2d 206, 209 (5th Cir. 1983) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

## III. ANALYSIS

### A. *Constructive Trust*

We turn first to the crux of this case, which is the bankruptcy court's holding that

12

since the spud date of the first date of the first well on each of the prospects which are the subject of this dispute, Swinehart has owned the indicated percentage and type interest in the prospect, the leases and lands which make up the prospect and each and every well drilled by or operated under the auspices of Haber Oil on such prospect and that Swinehart has been entitled to receive the proceeds from the sale of hydrocarbons produced by these wells attributable to his interests in such wells since that time.

The court thus held that Swinehart owned all the funds paid by purchasers of minerals from the disputed properties that were being held in escrow due to the pending state lawsuit. Because Haber Oil contended before the bankruptcy court that the disputed properties had been sold to McFadden, and because Swinehart had "agreed to accept in cash the present value" of his interests in those properties, the court directed Swinehart to execute documents assigning his interests in the disputed properties to Haber Oil, and it directed Haber Oil to pay for those interests. Both parties characterize the bankruptcy court's decision as imposing a constructive trust on the disputed properties. In fact, the bankruptcy court's award to Swinehart combined some features of a constructive trust (primarily in the form of priority over other creditors with respect to trust property) with an award of damages (giving Swinehart cash because the trust res was unavailable). Haber Oil argues that the bankruptcy court's award is on a record devoid of the pleadings, proof, and findings of fraud that are part and parcel of the constructive trust remedy. Swinehart, on the other hand, defends the bankruptcy court's decision to impose a constructive trust remedy. It is our task, then, to determine whether the

13

bankruptcy court properly awarded Swinehart the value of his interests in the disputed properties in "hundred-cent dollars."

1. *Constructive Trusts and the Bankruptcy Code*

We begin our analysis by reviewing the interface between federal bankruptcy law and state laws providing for the imposition of a constructive trust.

It has been well and often said that "ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws." Torres v. Eastlick (In re North Am. Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir. 1985), cert. denied, 475 U.S. 1083 (1986); see also Buckingham v. McLean, 54 U.S. (13 How.) 151, 166 (Dec. Term 1851) (describing the ratable distribution of property as "one of the two great objects of the [bankruptcy] law"); American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), 714 F.2d 1266, 1274 (5th Cir. 1983) (noting that the fundamental bankruptcy policy of "equality of distribution among creditors" permeates almost every provision of the Bankruptcy Code).

In effecting its underlying policies, the Bankruptcy Code defines the bankruptcy estate very broadly, encompassing most of the property held by the bankrupt. 11 U.S.C. § 541. Herein, however, lies the potentially uneasy interaction between federal and state law: in the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law. Chiasson v. J. Louis Matherne and Assocs. (In re Oxford Management, Inc.), 4

14

F.3d 1329, 1334 (5th Cir. 1993); see also Butner v. United States, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). The states can therefore have some effect on the operation of the federal bankruptcy system by exercising their power to define property rights. We have emphasized that "[s]tate law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities." Vineyard v. McKenzie (In re Quality Holstein Leasing), 752 F.2d 1009, 1014 n.10 (5th Cir. 1985).

The constructive trust doctrine common to many states takes on great significance in bankruptcy cases because of § 541(d) of the Code. Under that provision, if a debtor holds only legal title and not an equitable interest in property at the commencement of the bankruptcy case, that property becomes property of the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). Under the usual version of the constructive trust doctrine, one who has been unjustly enriched at another's expense is treated under state law much like a trustee, holding legal title for the injured party's benefit. Emily L. Sherwin, Constructive Trusts in Bankruptcy, 1989 U. ILL. L. REV. 297, 301 (1989). We have thus consistently recognized that § 541(d)

15

accords the beneficiary of a constructive trust, properly imposed under state law, the right to recover the trust property from the bankruptcy trustee or the debtor.  E.g., In re Quality Holstein Leasing, 752 F.2d at 1012; Georgia Pac. Corp. v. Sigma Serv. Corp., 712 F.2d 962, 968 (5th Cir. 1983); see also 4 COLLIER ON BANKRUPTCY ¶ 541.13 (Lawrence P. King et al. eds., 15th ed. 1993) ("Where the existence of a [constructive] trust has been established, the bankruptcy trustee will be ordered to turn over the property or proceeds [to the trust beneficiary] . . . ."). Because § 541(d) excludes property subject to a constructive trust from the bankruptcy estate, we have also held that § 541(d) prevails against the trustee's strong-arm powers under § 544. Sandoz v. Bennett (In re Emerald Oil Co.), 807 F.2d 1234, 1238 (5th Cir. 1987); In re Quality Holstein Leasing, 752 F.2d at 1012-15; see also Wisconsin v. Reese (In re Kennedy & Cohen, Inc.), 612 F.2d 963, 966 (5th Cir.), cert. denied, 449 U.S. 833 (1980).  Other courts have agreed with this approach.  See, e.g., Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc., 960 F.2d 366, 372 & n.2 (3d Cir. 1992); Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88, 93-95 (2d Cir. 1989).  But see Carlos J. Cuevas, Bankruptcy Code Section 544(a) and Constructive Trusts: The Trustee's Strong Arm Powers Should Prevail, 21 SETON HALL L. REV. 678, 723-69 (1991) (arguing that "a trustee should be immune from the affirmative defense of a constructive trust when using

section 544(a) to avoid an . . . unrecorded interest in real property").

The remedy of a constructive trust is thus a potent one in bankruptcy because it gives the successful claimant "priority over the defendant's unsecured creditors" to the extent of the property subject to the trust.  Sherwin, supra, at 305.  As a result, creditors of the bankrupt debtor have every incentive to argue that their unsecured claims are eligible under state law for the remedy of a constructive trust.  Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant "to impose constructive trusts without a substantial reason to do so."  Neochem Corp. v. Behring Int'l, Inc. (In re Behring Int'l, Inc.), 61 B.R. 896, 902 (Bankr. N.D. Tex. 1986); see also Dinkel Enters., Inc. v. Colvin (In re Bailey Pontiac, Inc.), 139 B.R. 629, 635 (N.D. Tex. 1992) ("A constructive trust is an equitable remedy that should not be imposed cavalierly, especially in the context of a bankruptcy proceeding.").  The burden of establishing the existence of the constructive trust rests on the claimant, as does the burden of identifying or tracing the trust property.  In re Oxford Management, 4 F.3d at 1335 & n.8; see also In re Emerald Oil, 807 F.2d at 1238 ("To profit from § 541(d), a party must demonstrate that state law impresses property that the debtor holds with an equitable interest in his favor that attached prior to bankruptcy.").

From the foregoing, it is clear that we must survey the law of Texas before we can determine whether Swinehart adequately demonstrated that he was entitled to a constructive trust in the disputed properties at the time Haber Oil's bankruptcy case commenced.  See In re Quality Holstein Leasing, 752 F.2d at 1014 n.10 ("[S]ection 541(d) overcomes the trustee's section 544 powers only where state law confers equitable title on a third party effective prior to the commencement of the bankruptcy case.").  Under Texas law, a constructive trust is not actually a trust, but rather an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act.  Ellisor v. Ellisor, 630 S.W.2d 746, 748 (Tex. App.SQHouston [1st Dist.] 1982, no writ); Lowther v. Lowther, 578 S.W.2d 560, 562 (Tex. Civ. App.SQWaco 1979, writ ref'd n.r.e.); see also Monnig's Dep't Stores, Inc. v. Azad Oriental Rugs, Inc. (In re Monnig's Dep't Stores, Inc.), 929 F.2d 197, 201 (5th Cir. 1991) (applying Texas law).  The two circumstances that generally justify the imposition of a constructive trust are actual fraud and the breach of a confidential or fiduciary relationship.  Meadows v. Bierschwale, 516 S.W.2d 125, 128 (Tex. 1974); Thigpen v. Locke, 363 S.W.2d 247, 250-53 (Tex. 1962); Grace v. Zimmerman, 853 S.W.2d 92, 97 (Tex. App.SQHouston [14th Dist.] 1993, no writ); Mims v. Beall, 810 S.W.2d 876, 881 (Tex. App.SQTexarkana 1991, no writ); see also In re Monnig's Department Stores, 929 F.2d at 201 (applying Texas law).  We have summarized the elements of a constructive trust under Texas law as (1) breach of a fiduciary

18

relationship or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res. In re Monnig's Department Stores, 929 F.2d at 201; see also Rosenberg v. Collins, 624 F.2d 659, 663 (5th Cir. 1980) (holding that, under Texas law, a constructive trust can attach only "to some identifiable property which can be traced back to the original property acquired by fraud").

Although Swinehart predicated his constructive trust claim in the state lawsuit on breach of a "confidential relationship," at oral argument Swinehart expressly disavowed any effort on his part, in the bankruptcy court or on appeal, to rely on breach of a fiduciary relationship, claiming instead that he had relied and continued to rely solely on the theory of actual fraud to justify the bankruptcy court's imposition of a constructive trust in his favor. We therefore concern ourselves only with the elements of fraud in Texas. It is well-established in Texas that a party claiming fraud must prove: (1) a material representation was made; (2) the representation was false; (3) the speaker made the representation knowing it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it be relied upon by the party; (5) the party acted in reliance on the misrepresentation; and (6) the party thereby suffered injury. Eagle Properties, Ltd. v. Scharbauer, 807 S.W.2d 714, 723 (Tex. 1990); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990), cert. denied, 111 S. Ct. 755 (1991); see also Jackson v.

19

Speer, 974 F.2d 676, 679 (5th Cir. 1992) (applying Texas law); Walker v. Federal Deposit Ins. Corp., 970 F.2d 114, 122 (5th Cir. 1992) (applying Texas law). We note that a promise of future performance does not constitute actionable fraud unless the promisor did not intend to perform at the moment he made his promise. In re Bailey Pontiac, 139 B.R. at 636 (citing Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986)).

Swinehart defends the decisions of the bankruptcy court, arguing strenuously that the court made sufficient findings to justify the remedy it awarded Swinehart and that the evidence supported that finding. We thus turn next to the issues of pleading, proof, and judicial findings.

## 2. *Pleadings*

We may begin our analysis with the proposition that if Swinehart's claim against the Haber Oil estate was one seeking an equitable interest in property, such as a constructive trust, rather than a general unsecured claim, it was incumbent on him to file an adversary proceeding in the bankruptcy court. A proceeding "to recover money or property" is an adversary proceeding, as are proceedings "to determine the validity, priority, or extent of a lien or other interest in property" and "to obtain an injunction or other equitable relief." Bankruptcy Rule 7001(1), (2), (7); see also Village Mobile Homes, Inc. v. First Gibraltar Bank, FSB (In re Village Mobile Homes, Inc.), 947 F.2d 1282, 1283 (5th Cir. 1991) (holding that a claim for damages for conversion is an adversary proceeding); In re Jensen, 946

20

F.2d 369, 372 (5th Cir. 1991) ("[A]n accounting and a constructive trust are traditionally equitable remedies."). Adversary proceedings are governed by Part VII of the Bankruptcy Rules, Bankruptcy Rule 7001, and the rules in Part VII generally "either incorporate or are adaptions of most of the Federal Rules of Civil Procedure."  Id. advisory committee's note.

Swinehart agrees that he made a demand for relief that necessitated an adversary proceeding under Bankruptcy Rule 7001, but he insists that the proceedings leading up to the bankruptcy court's September 4, 1990, order were in fact a full-blown adversary proceeding "for all substantive purposes."  As we have noted, Swinehart variously states in his brief that he filed the adversary proceeding on July 21 or July 27, 1988.  If Swinehart's statement is true, then he must have filed a complaint in keeping with Federal Rule of Civil Procedure 3, which is incorporated by Bankruptcy Rule 7003, and obtained and served a summons in keeping with Bankruptcy Rule 7004.  See also In re Village Mobile Homes, 947 F.2d at 1283 ("As [an adversary proceeding], the claim required the filing of a 'complaint.'").  Yet, Swinehart does not direct us to those documents in the appellate record, and our thorough search of the record has not brought them to light.  As a result, other key elements of adversary proceedings are missing, including an allegation of jurisdiction and a statement that the proceeding was "core or non-core."  Bankruptcy Rule 7008(a).  Additionally, Bankruptcy Rule 7016 adopts Federal Rule of Civil Procedure 16 in adversary proceedings, meaning that a

21

pretrial order should have been entered by the bankruptcy court to "control the subsequent course of the action unless modified." FED. R. CIV. P. 16(e). We find no pretrial order in the record, and the absence of a pretrial order has created more problems for this court than all of the other deficiencies in this record combined.[1]

Having detailed the deficiencies in the proceedings below, we now survey the pleadings that <u>do</u> appear in the record. Several of these pleadings relate to the plan confirmation process. On July 22, 1988, Swinehart filed an "expedited application to temporarily allow claim for the purpose of voting on plan of reorganization." This document states that Swinehart was seeking, <u>inter alia</u>, a constructive trust in the state lawsuit, but it does not state the amount of his claim against the bankruptcy estate. He filed an objection to confirmation of the reorganization plan on July 25, 1988. The objection also states that Swinehart was seeking a constructive trust in the state lawsuit. The objection does <u>not</u> seek relief from the bankruptcy court, except in an assertion that "[t]he primary post-confirmation fund as defined in the Plan should include a contested claim reserve fund to satisfy claims currently in litigation in collateral state court proceedings." On July 28,

---

[1] The mere fact that the clerk of the court announced the number of the case as including the adversary number cited by Swinehart does not change the analysis. Ordinary claims litigation is not transformed into an adversary proceeding simply by labelling it as one. Moreover, the clerk's announcement certainly did not afford Haber Oil the procedural safeguards of an adversary proceeding.

1988, the bankruptcy court confirmed the reorganization plan, but included in the confirmation order an additional order "that Haber Oil will not seek to withdraw the funds held in escrow on account of the Swinehart [claim]."

The next round of pleadings, as might be expected post-confirmation, focused on Swinehart's claim and the debtors' objections thereto. On October 5, 1988, the committee charged with responsibility under the plan for objecting to claims filed an objection to allowance of Swinehart's "unsecured claim in the Jay D. Haber bankruptcy in the amount of $2,300,000.00" and his "unsecured claim in the same amount in the Haber Oil Co., Inc. bankruptcy." No reference was made to an adversary proceeding or to a claim for a constructive trust or other equitable relief. Swinehart responded. It is important to note that Swinehart's response not only fails to mention any claim for a constructive trust, specific performance, or any other equitable remedy, but also states as follows:

> The amount of the <u>unsecured claims</u> filed by David D. Swinehart is a good faith representation of the amount of damages suffered by David D. Swinehart as a result of the actions of Jay D. Haber and Haber Oil, Inc. These matters have as yet to be adjudicated, but are scheduled for hearing before this court on November 28, 1988.

(emphasis added). Not surprisingly, the trial memorandum filed on November 22, 1988, by counsel for Jay Haber on behalf of Jay Haber and Haber Oil is absolutely silent on the subjects of fraud and constructive trusts, but rather devotes much attention to the issue of whether the third or fourth contract should govern

23

Swinehart's rate of compensation for the disputed properties.  On November 30, 1988 (the day before the hearing commenced in the bankruptcy court), Swinehart's counsel filed its "trial memo in support of claim of D. D. Swinehart."  In this document, for apparently the first time in the bankruptcy proceedings, Swinehart prays for a constructive trust to be imposed on the disputed properties.  The memo continues, "In the event the court is unable to award to Swinehart actual ownership interests in the oil and gas properties, Plaintiff prays the court will award damages for the fair market value of the reserves for those properties in which Swinehart has an interest."  No predicate for the imposition of a constructive trust is presented in Swinehart's request for a constructive trust.  Swinehart does allege in his statement of facts, however, that a "confidential relationship" existed between him and the Haber defendants, and later in the memo, Swinehart claims, "All of the actions of Haber and Haber Oil which have unjustifiably deprived Plaintiff [of] the receipt of proceeds due to him are being undertaken willfully, maliciously, and fraudulently by the Haber Defendants."  In an equally conclusory passage, Swinehart alleges in the alternative that the actions of Haber Oil constituted conversion of Swinehart's interests.

To sum up, then, Swinehart had filed a lawsuit in state court against Jay Haber and Haber Oil seeking a variety of remedies, such as compensatory and punitive damages and a constructive trust, before the Haber defendants filed for

24

bankruptcy.  From his very first involvement in the bankruptcy proceedings, Swinehart's conduct was consistent with that of an unsecured creditor.  Although he occasionally adverted to the fact that he was seeking a constructive trust in the pending state lawsuit, these references always occurred in conjunction with actions taken to protect his unsecured claim against Haber Oil.  These actions include his filing of an unsecured proof of claim, his application to have his claim allowed for the purpose of voting on the plan of reorganization, and his objection to the plan, which includes a passage urging the primary post-confirmation fund to include a "contested claim reserve fund to satisfy contested claims currently in litigation in collateral state court proceedings."  Not until literally the eve of the hearing on December 1, 1988, did Swinehart attempt to make his state constructive trust claim an issue in the federal bankruptcy proceedings.  As will be seen, this failure on Swinehart's part is fatal to his claim that Haber Oil effectively received all the procedural protection guaranteed by the adversary proceeding rules.

The defects in the above-listed pleadings and proceedings, if they are viewed as an attempted adversary proceeding, are legion.  As we have already stated, we find no pleadings in the record to indicate that Swinehart ever attempted to comply with the requirements of the bankruptcy rules governing adversary proceedings.  Even if Swinehart's trial memo could have sufficed as a bare-bones complaint had it been filed and served in a

25

timely manner, it conspicuously fails to comply with the long-standing requirement that, in a pleading averring fraud, "the circumstances constituting fraud . . . shall be stated with particularity."  FED. R. CIV. P. 9(b) (made applicable to adversary proceedings by Bankruptcy Rule 7009).  Although the defendant's state of mind may be averred generally, the party claiming fraud must allege "the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud ha[s] occurred."  Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.), 121 B.R. 166, 187 (Bankr. D. Vt. 1990) (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 119 (2d Cir. 1982)); see also Unimobil 84, Inc. v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986) ("To state a cause of action for fraud, however, requires a plaintiff to allege with particularity the defendant's acts which the plaintiff contends amount to fraud."); Askanase v. Fatjo, 148 F.R.D. 570, 574 (S.D. Tex. 1993) ("The allegations should allege the nature of the fraud, some details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants.").  Bankruptcy courts should and do insist that the stringent standard imposed by Bankruptcy Rule 7009 be observed by parties claiming fraud, particularly if the party asserting fraud has first hand knowledge of the fraudulent transaction.  In re Kelton Motors, 121 B.R. at 187.  In short, Swinehart did not satisfy the pleading requirements imposed in bankruptcy proceedings on creditors who wish to assert claims based on fraud.

26

Swinehart's contention that, "for all substantive purposes, an adversary proceeding was held" suggests that Haber Oil may have waived compliance with the requisites of an adversary proceeding. We have recognized that such a waiver is possible. In re Village Mobile Homes, 947 F.2d at 1283. But see In re McClain Airlines, Inc., 80 B.R. 175, 180 (Bankr. D. Ariz. 1987) ("[F]ailure to proceed by complaint when one is required is reversible error."). This case, however, does not present an appropriate circumstance for a finding of waiver. Swinehart argues that "[a]ll issues then existing between Haber Oil and Swinehart were fully ventilated." See Trust Corp. v. Patterson (In re Copper King Inn, Inc.), 918 F.2d 1404, 1407 (9th Cir. 1990) (holding that a party had waived its right to an adversary proceeding because an "extensive hearing and subsequent briefing" gave the party "ample time to air its position"). The difficulty with this position is that the record shows that Haber Oil was not given proper notice prior to the commencement of the post-confirmation proceedings in the bankruptcy court that it was being called upon to defend claims of fraud and constructive trust rather than a simple unsecured contract claim. Cases suggest that courts should not find waiver of the procedural protections required in adversary proceedings unless the parties are apprised of and have a chance to address all the issues being decided. See, e.g., In re Copper King Inn, 918 F.2d at 1407 (noting that the party against whom waiver was asserted did not show that it was "materially prejudiced by the course of

27

events"). Because none of Swinehart's actions up to the eve of the hearing suggested that he was seeking to enforce anything but an unsecured claim in the federal bankruptcy proceedings, Haber Oil cannot be held to have waived the adversary proceeding rules in this case.

The instant case demonstrates the difficulties that are apt to arise if the bankruptcy court too easily permits parties to circumvent the rules governing adversary proceedings. For instance, the informality of the proceedings below created a substantial question as to whether the proceedings were core or non-core proceedings; indeed, the attorneys for Jay Haber filed a motion (on Haber Oil's behalf) soon after the bankruptcy court orally rendered its ruling from the bench on December 1, 1988, seeking a determination that the proceedings were mere "related proceedings" instead of core proceedings. The adversary proceeding rules are designed precisely to assist the bankruptcy court in resolving this type of controversy early in the proceedings. 9 COLLIER ON BANKRUPTCY, supra, at ¶ 7008.03. Because Haber Oil was entitled to receive notice of the nature of Swinehart's claims against itSQnot to mention specific notice of the acts or omissions claimed to be fraudulentSQand Haber Oil apparently did not receive such notice as required by the bankruptcy rules governing adversary proceedings and claims of fraud, the bankruptcy court erred by reaching and ruling on Swinehart's claim seeking imposition of a constructive trust.

3. *Proof and Findings*

28

We have seen that the pleadings and proceedings below were seriously defective.  The deficiencies in the evidence in support of Swinehart's constructive trust claim and in the bankruptcy court's findings, however, were more grievous still.  Perhaps recognizing these deficiencies, Swinehart does not direct our attention to any portions of the record that demonstrate specific fraudulent conduct by Haber Oil; indeed, Swinehart's own statement of the facts does not refer to a single misrepresentation that might constitute a fraudulent act.  In lieu of specific citations to evidence of fraud in the record, Swinehart merely alleges in his brief that "the actions of Haber Oil were replete with fraudulent undertones."  Our independent review of the record, particularly the transcripts of the hearings held before the bankruptcy court, reveals the cause of Swinehart's reticenceSQrecord evidence of the elements of fraud is lacking.

We turn first to the evidence adduced at the December 1, 1988, hearing, after which the bankruptcy court orally advised Haber Oil to reacquire any of Swinehart's interests that might have been conveyed away.  Swinehart testified primarily about the circumstances surrounding the negotiation of the fourth contract and his understanding that the contract applied only prospectively.  He also testified that in 1983 Haber Oil fell behind in paying him monies to which he was entitled under the contract then in effect and that Jay Haber continually made excuses to Swinehart to put off paying him.  Apparently Jay Haber

29

often told Swinehart that an accounting was necessary and would be forthcoming, and he also said that the revenues and the expenses attributable to Swinehart's interests were probably "a wash." Swinehart also contradicted Jay Haber's testimony from earlier in the hearing regarding the reasons Jay Haber ultimately terminated Haber Oil's relationship with Swinehart.[2] At the end of the hearing, in closing argument, Swinehart's attorney agreed with Haber Oil's attorney's characterization of the issue before the court as "a fairly plain and simple contractual dispute."

Swinehart also testified at the second hearing, held July 20-21, 1989. The purpose of this hearing, as the bankruptcy court explained it at the end of the first hearing, was simply to resolve any lingering issues of accounting and valuation, and the opening statement by Haber Oil's attorney indicates his belief that the court's award to Swinehart of "prospect profit and the unassigned interest" arose out of a "pre-petition breach of contract, which is a claim for monetary damages." The vast majority of Swinehart's testimony focused on intricate accounting issues, but before plunging into those issues he did testify briefly about his attempts to get Jay Haber to pay him his compensation before and during 1983. At one point Swinehart may have begun to scratch the surface of the necessary elements for

---

[2] Jay Haber had testified that Swinehart withheld files and information belonging to Haber Oil, and that, after repeatedly asking Swinehart to return the files and seeking advice from counsel, he terminated Haber Oil's contractual relationship with Swinehart. According to Swinehart, Haber Oil was never denied access to the files.

30

fraud when he testified that Jay Haber had rebuffed his efforts by showing him Haber Oil's profit analysis (apparently for 1982) in order to make him "feel comfortable." He also opined, "Well, he [Jay Haber] wanted to demonstrate to me that we were doing very well, we were making a lot of money, keep up the good work and go out and find some more prospects."[3]

In our view, the testimony from Swinehart, Jay Haber, and others indicates that Swinehart's relationship with Haber Oil deteriorated in 1984, leading ultimately to the termination of that relationship, and that Swinehart and Haber Oil disagreed regarding the amount of compensation due him for his services that he had already performed. What the record does not show is that Haber Oil ever defrauded Swinehart under the Texas definition of fraud. We find no evidence that any of Jay Haber's factual representations to Swinehart were false or that Haber made any promises to him with the intent not to carry them out, as is required under Texas law for a promise of future performance to be actionable fraud. Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986). The mere fact that Haber

---

[3] Swinehart's testimony on this score is so brief and cryptic that it is impossible for us to discern precisely what Swinehart was seeking from Jay Haber when Haber made these alleged reassurances. In any event, because the third contract was already in force when these reassurances were made, Swinehart could not have relied on the reassurances to his detriment. All the damages he now claims stems from Haber Oil's breach of the third contract, and he was already bound by that contract when the reassurances were made. Thus, there could not have been a causal link between the reassurances and his entering into the third contract. Moreover, Swinehart's testimony does not come close to establishing the mens rea element of fraud.

31

Oil failed to perform is not evidence of fraudulent intent.  In re Bailey Pontiac, 139 B.R. at 636 (citing Dodson v. Kung, 717 S.W.2d 385, 389 (Tex. App.SQHouston [14th Dist.] 1986, writ ref'd n.r.e.)).  The evidence proves only that Haber Oil failed to perform and frequently stalled Swinehart in his efforts to collectSQnot an unusual course of action for a debtor beginning a slide into bankruptcy.  In short, Swinehart did not prove that Haber Oil knowingly or recklessly misrepresented facts to him with the intent of inducing reliance, or that he did rely on any such misrepresentations to his detriment.

Given the dearth of record evidence to support a finding of fraud, we are not surprised to find that the bankruptcy court never made specific findings that Haber Oil defrauded Swinehart. The only "express" finding of fraud by the court below that Swinehart cites comes from the bankruptcy court's dismissal of Haber Oil's adversary proceedings based on § 544 (and not, it may be noted, from the September 4, 1990, order in which the court awarded Swinehart real property interests in the disputed properties).  In the dismissal order, the bankruptcy court stated, "In this Adversary Proceeding, Haber Oil seeks to gain an advantage from its failure to carry out its contracts.  Clearly Chapter 11 of the Bankruptcy Code must not be used as a tool to perpetrate fraud on a third party."  Swinehart's argument that this passage is an express finding by the bankruptcy court that Haber Oil committed the fraud necessary to justify imposition of a constructive trust is, to say the least, without merit.  We

32

believeSQas the first quoted sentence from the bankruptcy court's dismissal order suggestsSQthat the bankruptcy court's order of September 4, 1990, in reality awarded Swinehart a constructive trust as the remedy for a simple breach of contract claim.

The bankruptcy court's decision to impose a constructive trust on the disputed properties in favor of Swinehart suffers from a further defect: a constructive trust can attach only to a specific res, or to some identifiable property that can be traced back to the original res acquired by fraud. Rosenberg, 624 F.2d at 663; see also Meadows, 516 S.W.2d at 129 ("[A] constructive trust on unidentifiable cash proceeds is inappropriate."). This requirement, which is also commanded by federal bankruptcy law, In re Kennedy & Cohen, 612 F.2d at 966, was not satisfied in the instant case, at least with respect to the real property itself. Indeed, as far as we can tell, no serious effort was made in the proceedings below to award Swinehart his real property interests in the disputed properties, or to determine who was in possession of those properties. Instead, upon hearing Haber Oil's contention that the properties had been sold to McFadden, the bankruptcy court devised a unique remedy that Swinehart had not even requested: a "deemed sale" of the disputed properties from Swinehart back to Haber Oil. This technique may not be used to circumvent the tracing requirements inherent in the assertion of a constructive trust theory in bankruptcy proceedings.

The bankruptcy court's award of the funds paid into the registry of the state court during the pendency of the state

33

lawsuit to Swinehart is subject to analysis similar to that applicable to the properties themselves, although tracing is not a problem with respect to the funds.  The bankruptcy court's conclusion that Swinehart owned those funds was dependent on its finding that Swinehart owned the real property interests that generated the funds.  As we have seen, however, Swinehart never established, through proper pleadings and proof, that he was a constructive trust beneficiary, or indeed that he was anything except an unsecured creditor.  Because his entitlement to the suspended funds in the state court stands or falls with his status as "owner" of interests in the disputed properties, the bankruptcy court's finding that Swinehart is the outright owner of all the funds being suspended because of the state lawsuit must also be reversed.[4]

We can only conclude, judging from the remarkable steps taken by the bankruptcy court in this case to give Swinehart a preferred status vis-a-vis the general unsecured creditors of Haber Oil, that the court below felt that the equities of the case strongly favored granting Swinehart special relief.  Even the broad powers of bankruptcy courts to fashion equitable remedies, however, must be exercised only within the confines of

---

[4] We do not understand our course of action to disturb the unchallenged order confirming the plan of reorganization, which merely directed Haber Oil not to seek to withdraw the funds placed in escrow because of the Swinehart claim.  Clearly this order was to last only until a court with proper jurisdiction determined who was entitled to those funds.  Our disposition of this appeal does, of course, reverse the bankruptcy court's determination of Swinehart's entitlement to the funds.

the Bankruptcy Code.  <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197, 206 (1988).  The bankruptcy courts are not "roving commission[s] to do equity."  <u>United States v. Sutton</u>, 786 F.2d 1305, 1308 (5th Cir. 1986).  Haber Oil clearly breached its contract with Swinehart, and it added insult to injury by promising payment and then failing to deliver.  The bankruptcy reporters, however, are replete with the stories of creditors who have furnished goods or services to a debtor, only to find that, despite their frequent demands and the debtor's countless reassurances, the debtor's promise of payment continues in breach.  It would spawn chaos in the careful order of priorities established by the bankruptcy law if bankruptcy courts made special exceptions for these creditors.  The requirements of pleadings, proof, and findings must be strictly enforced against constructive trust claimants to protect the integrity of the bankruptcy system.

Because the orders of the bankruptcy court imposing a constructive trust on the disputed properties in favor of Swinehart, deeming a hypothetical sale of those properties back to Haber Oil, and awarding Swinehart the funds held in suspense in the state court were not supported by the necessary pleadings, proof, and findings, they must be reversed.

## B. *Contract Interpretation*

Haber Oil argues that the bankruptcy court erred in ruling that Swinehart's interest in the disputed properties should be determined according to the terms of the third contract rather

35

than those of the fourth contract.  The interpretation of an unambiguous contract is a question of law and is therefore subject to our de novo review.  Guidry v. Halliburton Geophysical Servs., Inc., 976 F.2d 938, 940 (5th Cir. 1992).  However, when a contract is ambiguous and its construction turns on the consideration of extrinsic evidence, we review the interpretation of the court below for clear error only.  Id.  The initial determination that a contract is ambiguous and that its interpretation requires the consideration of extrinsic evidence is a legal conclusion subject to de novo review.  Id.  State law, however, provides the rules governing the interpretive process itself.  River Prod. Co. v. Webb (In re Topco, Inc.), 894 F.2d 727, 738 (5th Cir. 1990).

We hold that the third and fourth contracts are ambiguous with respect to the proper method to calculate Swinehart's interest in the disputed properties.  A contract is ambiguous if its terms are susceptible to more than one reasonable interpretation.  Amoco Canada Petroleum Co. v. Wild Well Control, Inc., 889 F.2d 585, 587 (5th Cir. 1989); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  In our view, Haber Oil and Swinehart both propose plausible interpretations of the contracts at issue.  The fourth contract simply does not address the subject of the compensation due Swinehart for his review and recommendation of prospects to Haber Oil prior to the effective date of the fourth contract when actual drilling was postponed until after the effective date of the fourth contract.

36

Reviewing the contracts and the record of the December 1, 1988, hearing, we conclude that the bankruptcy court did not clearly err in holding that the terms of the third contract dictated Swinehart's compensation for his review and recommendation of the disputed properties to Haber Oil. In the first place, the tone of the fourth contract is distinctively prospective. By its terms, Swinehart promised to "locate, evaluate, and recommend to Haber [Oil] a minimum of six (6) acceptable drilling prospects during the term of this contract." In return, Haber Oil promised to deliver specified interests to Swinehart "[f]or any prospects reviewed and recommended by Swinehart," suggesting to us that these rates of compensation were intended to apply only to the new prospects located by Swinehart during the lifetime of the fourth contract. We note also that the fourth contract did not expressly supersede the third contract, although the third contract did expressly supersede the contract that preceded it.

The bankruptcy court also made the cogent observation that, at the time the parties executed the fourth contract, Swinehart had already performed all his obligations under the third contract with respect to the disputed properties. His compensation under that contract had already been earned. If the parties had intended to alter the compensation due under the third contract, one would expect the fourth contract to deal with that obligation expressly. Finally, the court heard testimony from both parties as to their understanding of the meaning of

37

these contracts, and it was entitled to give credence to whatever testimony it found believable.  This is not to say that Haber Oil's arguments that the fourth contract should govern Swinehart's return from the disputed properties are wholly without logical force.  We hold only that, under our deferential standard of review, the bankruptcy court's interpretation was not a clearly erroneous one.

## C. *The Frnka Prospect*

We must delve deeper into the facts of this case before addressing Haber Oil's argument that the bankruptcy court erred in its holding regarding Swinehart's rights in the Frnka prospect.

The Frnka prospect was a property reviewed and recommended to Haber Oil by Swinehart during the lifetime of the third contract.  Under that contract, Swinehart had the right to return up to 75% of his earned interest and to "be paid by Haber [Oil] an amount equal to the completion costs of the well in which such interests are held."  The bankruptcy court found that Swinehart returned his interest in the Frnka prospect in accordance with the terms of the third contract.  Therefore, the court held that "no completion costs for the Frnka Prospect shall be included in the calculation of 'Completion costs Haber paid on Swinehart's behalf.'  Swinehart shall not include any sum attributable to his return of the Frnka interest as a portion of the compensation due him from Haber Oil."

Haber Oil now argues that we should reverse the bankruptcy court's decision, which allowed Swinehart to avoid bearing his proportionate share of the cost of completion of the well on the Frnka prospect. According to Haber Oil, this is inequitable because Swinehart did not try to return this interest until some two years after the well was completed, when it was clear that the completion was uneconomical. Jay Haber testified at the July 20-21, 1989, hearing that drilling on the Frnka prospect commenced around December 1982 or January 1983, and that the well was productive but not profitable. He also testified that the first attempt Swinehart made to return his interest in the Frnka prospect was in mid-1984. Haber Oil therefore argues that the bankruptcy court erred in interpreting the contract to allow Swinehart to return his interest in the Frnka prospect and avoid paying completion costs after it had become clear that the well would not become a profitable one.

Jay Haber and Swinehart both testified at the July 20-21, 1989, hearing that several attempts to complete a well on the Frnka prospect were made and failed before a producing well was successfully completed. Swinehart conceded that he did not withdraw from participation in that prospect until after the second attempt to complete a well had failed, and he testified that he should bear his share of those costs. He also testified that he told Jay Haber at this point that he wanted out of the Frnka operation and that the enterprise would not succeed, and Jay Haber sent him an "election form," apparently to allow

39

Swinehart to withdraw from future Frnka operations. Swinehart then sent Haber Oil a telegram notifying it that he was exercising his option to return 75% of his interest in the Frnka prospect.

The bankruptcy court examined the terms of the third contract and found no language providing that Swinehart could not return his interest in a prospect after some work had been completed. It therefore allowed a credit to Swinehart for his share of the completion costs of the Frnka well, and it disallowed any claim by Swinehart to compensation based on his interest in the Frnka prospect. Haber Oil's argument that the third contract should not be interpreted to allow Swinehart to exercise his option "years after the completion of the well," although logical, is not supported by the record. Indeed, the record indicates that Swinehart withdrew from the Frnka enterprise before the well was successfully completed. Again confronted with an ambiguous contract provision, we hold that the bankruptcy court did not clearly err in its interpretation of the third contract with respect to the Frnka prospect controversy.

D. *The Black Jack Creek East Prospect*

Haber Oil argues that the bankruptcy court erred in ruling that Swinehart did not have to bear a proportionate share of the expenses and losses attributable to the promotion of the Black Jack Creek East prospect. Jay Haber testified at the December 1, 1988, hearing that this prospect, located in the panhandle of Florida, was reviewed and recommended to Haber Oil by Swinehart

40

in early 1982, and Haber Oil acquired leases in that prospect in mid-1982.  Haber Oil was unable to attract investors in the prospect, and its leases eventually expired, resulting in a loss to the company.  The bankruptcy court, in its September 4, 1990, order, held that Swinehart was not required to share in the expenses and overall loss generated by the Black Jack Creek East prospect.

According to Haber Oil, the language of the third contract clearly required Swinehart to pay a proportionate share of the losses and expenses Haber Oil suffered in connection with the Black Jack Creek East prospect.  Haber Oil relies on a handwritten clause, initialed by Jay Haber and Swinehart, in the third contract that reads, "Lease profits shall be defined as all cash profits less all cash losses from lease transactions during any calculation period."  Swinehart, therefore, should have been required to participate in the Black Jack Creek East losses.  The bankruptcy court reached the opposite result by relying on a different section of the third contract.  The clause relied upon reads, "Haber shall deliver to Swinehart 50 percent of that carried working interest and/or other revenue interest that is retained by Haber after sale to investors or other party of prospect solicited, reviewed and recommended by Swinehart, subject to the following adjustment: . . . ."  The bankruptcy court viewed this section as limiting Swinehart's liability for losses to those prospects in which he actually possessed an interest; because the Black Jack Creek East prospect was never

sold to investors, the court reasoned, Swinehart never received an interest in the prospect and thus never became liable for the losses generated by the prospect.

We hold that the contract was ambiguous in that it does not clearly define the circumstances under which Swinehart's liability for a proportionate share of costs should begin. It certainly does not address the issue of which party should bear promotion costs for prospects, such as Black Jack Creek East, that failed for lack of investors. Because the bankruptcy court's interpretation was not clearly erroneous, we affirm it.


## IV. CONCLUSION

The bankruptcy court erred in granting Swinehart a constructive trust in the disputed properties and in awarding him the funds held in escrow because of the state lawsuit. Accordingly, the district court's order affirming the award of the full value of those properties ($971,689) and the suspended funds to Swinehart must be REVERSED and these cases REMANDED to the district court with instructions to REMAND to the bankruptcy court for further proceedings consistent with this opinion. In all other respects the court below is AFFIRMED. Each party shall bear its own costs.